THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Civil Action No.</td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>CHURCHILL DOWNS LOUISIANA</td><td>)</td><td>Judge</td></tr>
<tr><td>HORSERACING COMPANY, LLC</td><td>)</td><td></td></tr>
<tr><td>d/b/a FAIR GROUNDS</td><td>)</td><td></td></tr>
<tr><td>RACE COURSE AND SLOTS,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## COMPLAINT

The United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency (the "EPA"), files this Complaint and alleges as follows:

## NATURE OF THIS ACTION

1.      This is a civil action brought under Section 309 of the Clean Water Act (the "Act"), 33 U.S.C. § 1319, against Churchill Downs Louisiana Horseracing Company, LLC d/b/a Fair Grounds Race Course and Slots ("Churchill Downs") for: (1) discharging process wastewater from three outfalls at Churchill Downs' horse-racing and stabling facility known as the "Fair Grounds Race Course" in New Orleans, Louisiana (the "Facility"), a concentrated animal feeding operation ("CAFO"), into the municipal separate storm sewer system operated by the Sewerage and Water Board of New Orleans ("SWBNO"), and referred to herein as the "SWBNO MS4," and other receiving waters other than during qualifying rain events, in violation

1

of the terms and conditions of the National Pollutant Discharge Elimination System ("NPDES")

permit issued to Churchill Downs under Section 402 of the Act, 33 U.S.C. § 1342 (the "Permit");

(2) failing to comply with nutrient management plan practices and requirements at the Facility,

in violation of the terms and conditions of the Permit; (3) failing to timely submit discharge

monitoring reports ("DMRs"), in violation of the terms and conditions of the Permit; (4) failing

to fully and completely report discharges of process wastewater from the production area at the

Facility, including, for each discharge, the date of discovery, duration of, and approximate

volume of the discharge, in violation of the terms and conditions of the Permit; and (5) failing to

monitor and report all pollutants, in violation of the terms and conditions of the Permit.

2.      The United States seeks injunctive relief and civil penalties under Section 309(b)

and (d) of the Act, 33 U.S.C. § 1319(b) and (d).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to

Section 309(b) of the Act, 33 U.S.C. § 1319(b), and under 28 U.S.C. §§ 1331, 1345, and 1355.

This Court has personal jurisdiction over Churchill Downs, which does business in the State of

Louisiana and in this judicial district.

4.      Authority to bring this action is vested in the United States Department of Justice,

on behalf of the EPA, pursuant to Sections 309 and 506 of the Act, 33 U.S.C. §§ 1319 and 1366,

and under 28 U.S.C. §§ 516 and 519.

5.      Venue is proper in the Eastern District of Louisiana pursuant to Section 309(b) of

the Act, 33 U.S.C. § 1319(b), and under 28 U.S.C. § 1391(b) and (c) and 1395(a), because

Churchill Downs does business in this judicial district and the violations alleged in this

Complaint occurred and are occurring at the Facility, which is located in this judicial district.

**NOTICE**

6.     Notice of the commencement of this action was given to the Louisiana Department of Environmental Quality (the "LDEQ") pursuant to Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

**DEFENDANT**

7.     Churchill Downs is a limited liability company organized and existing under the laws of the State of Louisiana.

8.     Churchill Downs is, and was at all times relevant to this Complaint, a person within the meaning Section 502(5) of the Act, 33 U.S.C. § 1362(5).

9.     Churchill Downs is, and was at all times relevant to this Complaint, the owner and operator of the Facility.

**STATUTORY AND REGULATORY BACKGROUND**

**A.     The Clean Water Act and the NPDES Permit Program**

10.     The objectives of the Act are to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.  33 U.S.C. § 1251(a).

11.     To accomplish these goals, Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" from a point source to waters of the United States except, as applicable here, in compliance with a NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

12.     CAFOs are point sources of pollution that are subject to NPDES permitting requirements and must not discharge pollutants unless the discharge is authorized by a NPDES permit. 33 U.S.C. §§ 1311(a) and 1362(14); *see* 40 C.F.R. § 122.23(a) and (d).  In order to obtain authorization under a NPDES permit, the CAFO owner must either apply for an individual

NPDES permit or submit a notice of intent for coverage under a NPDES general permit.  40 C.F.R. § 122.23(d)(1).

13.     Section 402(b) of the Act, 33 U.S.C. § 1342(b), authorizes each state to administer its own NPDES permit program under state law if the state program has been approved by the Administrator of the EPA.  The State of Louisiana has been authorized by the EPA to administer its NPDES program since August 1996.  61 Fed. Reg. 47932 (September 11, 1996).  The LDEQ administers the NPDES permit program through the Louisiana Pollutant Discharge Elimination System ("LPDES") permit program.

14.     When a State is authorized to administer the NPDES permit program pursuant to Section 402(b) of the Act, 33 U.S.C. § 1342(b), the EPA retains the authority, concurrent with the authorized state, to enforce state-issued NPDES permits under Section 309(a)(3) of the Act, 33 U.S.C. § 1319(a)(3).  33 U.S.C. § 1342(i).

15.     Under Section 309(b) of the Act, 33 U.S.C. § 1319(b), NPDES or LPDES permit noncompliance may result in the commencement of a civil action.

**B.     The LPDES Permit Program**

16.     LDEQ's general LPDES program requirements, which apply to facilities covered by LPDES permits, are set forth in Title 33 of the Louisiana Administrative Code ("LAC") at Part IX (Water Quality), Subpart 2, Chapter 23.  LAC 33:IX.2301.

17.     Additional conditions apply to specified categories of the LPDES permits, including LPDES permits issued to CAFOs.  LAC 33:IX:2703.  As relevant to this Complaint, a "CAFO" is defined for purposes of the LPDES program as, *inter alia*, an animal feeding operation ("AFO") that meets certain "Large CAFO" or "Medium CAFO" size thresholds, which are specific to the number and types of animals stabled or confined.  LAC 33:IX:2505.B.

18.     As relevant to this Complaint, an "AFO" is defined as " a lot or facility  . . . where the following conditions are met: (a) animals . . . have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period; and (b) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility."  LAC 33:IX:2505.B.

19.     A horse AFO is defined as a "Large CAFO" when it "stables or confines as many or more than . . . 500 horses."  LAC 33:IX:2505.B.

20.     As relevant to this Complaint, CAFOs are also subject to special LPDES program requirements, which are set forth in LAC 33:IX:2505, including the requirement to seek coverage under an LPDES permit if the CAFO discharges pollutants to Waters of the State. LAC 33:IX:2505.D.1; *see also* LAC 33:IX:2501.A.1. and LAC 33:IX:2313 (defining terms).

21.     In order for a CAFO to obtain authorization under an LPDES permit, "the CAFO owner or operator shall either apply for an individual LPDES permit or submit a notice of intent for coverage under an LPDES general permit."  LAC 33:IX.2505.D.1.

**C.     The Facility's LPDES Permit**

22.     Churchill Downs applied for and was issued an LPDES permit by the State of Louisiana, through the LDEQ, on January 6, 2012, with an effective date of February 1, 2012, LPDES Permit No. LA0115282, AI No. 14428 (the "Permit").

23.     The Permit was set to expire five years after its effective date, but it remains effective, pursuant to LAC 33:IX:2321, because it was administratively continued upon the LDEQ's receipt of the Churchill Downs' August 4, 2016, LPDES Renewal Application for Permit No. LA0115282, which remains pending with the LDEQ.

24.     The Permit (on the issuing page signed by the LDEQ issuing authority) authorizes Churchill Downs to discharge from the Facility to specified receiving waters only in accordance with the effluent limitation requirements, monitoring requirements, record-keeping requirements, narrative requirements, standard conditions, and other specific requirements of the Permit.

**(1) General Incorporation of all LPDES Permit Requirements into the Permit**

25.     The Permit (in Part III, "Standard Conditions for LPDES Permits," Section A (General Conditions)) cites the provisions of LAC 33:IX.2701 and incorporates either expressly or by reference all conditions and requirements for LPDES permits as set forth by the Louisiana Environmental Quality Act (the "LEQA"), as amended, LSA-R.S. 30:2001 *et seq*., and all applicable regulations.

26.     The applicable state regulations incorporated into the Permit are codified at Title 33, Part IX of the LAC and are designed to protect the environment and provide a program for issuing permits as necessary to assure compliance with applicable federal and state laws.  33 LAC:IX.101–7399.  *See* La. R.S. 30:2011(A) and (D).  The Permit (in "Other Conditions," Section C) incorporates definitions pertaining to CAFOs as set forth by both the LDEQ, at LAC 33:IX.2705, and the EPA, at 40 C.F.R. § 412.12, as applicable.

27.     In accordance with LAC 33:IX.2701.A, as incorporated into the Permit, Churchill Downs, as the LPDES permittee, has the duty to comply with all conditions and limitations in the Permit, and any Permit noncompliance constitutes a violation of the Act (and the LEQA) and is grounds for an enforcement action; for permit termination, revocation and reissuance, or modification; or denial of a permit renewal application.  *See also* 33 U.S.C. § 1319(b) (providing federal authority for civil enforcement of LPDES permit violations under the Act).

**(2) Limitation on Discharges**

28.    The Permit allows the Facility to discharge process wastewater to SWBNO MS4 through three Outfalls, designated Outfall 001, Outfall 002, and Outfall 003, only as described below.

29.    Specifically, the Effluent Limitations and Monitoring Requirements section of the Permit allows the Facility to "discharge, during a qualifying rain event, [] non-contact storm water commingled with horse wash down water" from the three permitted outfalls to designated receiving waters.  The Permit (on the issuing page signed by the LDEQ issuing authority) designates the receiving waters as the storm drains of the SWBNO MS4, "thence to Florida Canal (Drainage Pump Station #3), thence to London Avenue Canal Outfall, thence to Lake Pontchartrain."  The Permit (in "Other Conditions," Par. F (25-Year, 24-Hour Precipitation Event)) specifies that a qualifying rain event for the Permit is a 25-year/24-hour precipitation event, which is an event of approximately 10 inches of rainfall in a 24-hour period.

30.    As used in the LPDES permit program, the conditions of which are incorporated into the Permit, the term "discharge" when used without qualification means the "discharge of a pollutant," which means, "any addition of any pollutant or combination of pollutants to [W]aters of the [S]tate from any point source . . . includ[ing] additions of pollutants into [W]aters of the [S]tate from: surface runoff which is collected or channeled by man; [and] discharges through pipes, sewers, or other conveyances owned by a state, municipality, or other person which do not lead to a treatment works . . . ."  LAC 33:IX.2313.A (defining "discharge" and "discharge of a pollutant").

31.    As used in the LPDES permit program, the conditions of which are incorporated into the Permit, the term "pollutant" includes "biological materials . . . sand . . . and agricultural waste discharged into water." LAC 33:IX.2313.A.

32.    The Permit (in Section F, "Definitions") defines the term "Waters of the State" as "for the purposes of the Louisiana Pollutant Discharge Elimination System, all surface waters within the state of Louisiana and, on the coastline of Louisiana and the Gulf of Mexico, all surface waters extending there from three miles into the Gulf of Mexico.  For purposes of the Louisiana Pollutant Discharge Elimination System, this includes all surface waters which are subject to the ebb and flow of the tide, lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, natural ponds, impoundments of waters within the state of Louisiana otherwise defined as 'waters of the United States' in 40 C.F.R. 122.2, and tributaries of all such waters. 'Waters of the [S]tate' does not include waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the Clean Water Act, 33 U.S.C. 1251 *et seq*."

33.    As used in the LPDES permit program, the conditions of which are incorporated into the Permit, the term "point source" is defined to include CAFOs. LAC 33:IX.2313.A.

34.    The Permit does not authorize any discharge of pollutants from the Facility to the SWBNO MS4 during dry weather or during a rainfall event less than 10 inches in a 24-hour period.

### (3) Nutrient Management Plan Conditions

35.    In accordance with LAC 33:IX.2701.D, as incorporated into the Permit, Churchill Downs, as the LPDES permittee, has the duty to, at all times, properly operate and maintain all

facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of the Permit.

36.     The Permit (in "Other Conditions," Par. H (Nutrient Management Plan)) specifically requires Churchill Downs to have and implement a Nutrient Management Plan ("NMP") that complies with the requirements of LAC 33:IX.2703.E.

### a.  Best Management Practices to Meet CAFO Limitation on Discharges

37.     LAC 33:IX.2703.E.1 requires a CAFO's NMP to contain best management practices ("BMPs") necessary to, *inter alia*, meet the applicable effluent limitations and standards for CAFOs specified in 40 C.F.R. Part 412.

38.     As used in the LPDES permit program, the conditions of which are incorporated into the Permit, the term "BMPs" is defined as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of Waters of the State.  BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal or drainage from raw material storage."  LAC 33:IX.2313.A.

39.     40 C.F.R. Part 412 contains effluent limitations and standards that apply to discharges resulting from CAFOs.  *See* 40 C.F.R. § 412.1.  The term "CAFO," as used by 40 C.F.R. Part 412, is defined by the EPA in 40 C.F.R. § 122.23, which are the EPA's revised rules, promulgated in 2012, for NPDES permit regulation for CAFO operations.  40 C.F.R. § 412.12(b).  *See* 77 Fed. Reg. 44494 (July 30, 2012).

40.     As relevant to this Complaint, the EPA defines a "CAFO," using the same definition as LDEQ, as alleged above in Paragraph 17; the EPA defines an "AFO" using the same definition as LDEQ, as alleged above in Paragraph 18; and the EPA uses the same size

threshold of 500 horses or more for a horse AFO to be considered a "Large CAFO," as alleged

above in Paragraph 19.  40 C.F.R. § 122.23.

41.    40 C.F.R. Part 412, Subpart A, sets forth effluent limitations that specifically

apply to, *inter alia*, discharges resulting from production areas at horse CAFOs that qualify as

Large CAFOs.  40 C.F.R. § 412.10.

42.    The term "production area" is defined by the effluent limitation applicable to

large horse CAFOs as "that part of an AFO that includes the animal confinement area, the

manure storage area, the raw materials storage area, and the waste containment areas." 40 C.F.R.

§ 412.2(h).  Specifically, "the animal confinement area includes but is not limited to, open lots

… stall barns, free stall barns, walkers, animal walkways, and stables[;] [t]he manure storage

area includes but is not limited to … storage sheds, stockpiles … static piles, and composting

piles[;] [t]he raw materials storage area includes but is not limited to . . . bedding materials[;]

[and] [t]he waste containment area includes but is not limited to … areas within berms and

diversions which separate uncontaminated storm water." *Id*.

43.    As relevant to this Complaint, the effluent limitation attainable by the application

of best available technology economically available (BAT) that applies to large horse CAFOs is

a "zero discharge" limitation with an explicit, limited exception.  40 C.F.R. § 412.13(a).

Specifically, "there shall be no discharge of process waste water pollutants into U.S. waters,"

except that discharges are permissible "whenever rainfall events cause an overflow of process

wastewater from  a facility designed, constructed, operated, and maintained to contain all

process-generated wastewaters plus the runoff from a 25-year, 24-hour rainfall event at the

location of the [CAFO]." 40 C.F.R. § 412.13.

44.    Under 40 C.F.R. § 412.2 (General Definitions), the general definitions and abbreviations at 40 C.F.R. Part 401 apply to the requirements of 40 C.F. R Part 412.

45.    The term "discharge of pollutant(s)" as used by the effluent limitation applicable to large horse CAFOs means, *inter alia*, "the addition of any pollutant to navigable waters from any point source."  40 C.F.R. § 412.2(a); 40 C.F.R. § 401.11(h).

46.    The term "process waste water pollutants" as used by the effluent limitation applicable to large horse CAFOs means "pollutants present in process waste water." 40 C.F.R. § 412.2(a); 40 C.F.R. § 401.11(r).

47.    The term "pollutant" as used by the effluent limitation applicable to large horse CAFOs means, *inter alia*, "biological materials . . . and agricultural waste discharged into water." 40 C.F.R. § 412.2(a); 40 C.F.R. § 401.11(f).

48.    The term "process wastewater" as used by the effluent limitation applicable to large horse CAFOs means "water directly or indirectly used in the operation of the CAFO for any or all of the following: . . . washing, cleaning or flushing pens, barns, manure pits, or other CAFO facilities; . . . washing[ ] or spray cooling of animals; or dust control.  Process wastewater also includes any water which comes into contact with any raw materials, products, or byproducts including manure . . . feed . . . or bedding." 40 C.F.R. § 412.2(d); *cf.* 40 C.F.R. §§ 401.11(q) (defining "process waste water" generally for all sources subject to effluent guidelines) and 40 C.F.R. § 401.10 (directing that the specialized definition of "process wastewater" for the horse CAFO point source category in 40 C.F.R. Part 412 controls in the event of a conflict with a definition under 40 C.F.R. Part 401).

49.    The term "navigable waters" as used by the effluent limitation applicable to large horse CAFOs means "waters of the United States, including the territorial seas," which has been

further defined by the effluent limitation as, *inter alia*, "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide" and "all impoundments" of such waters and "tributaries" to such waters. 40 C.F.R. § 412.2(a); 40 C.F.R. § 401.11(l) (1993).

### b.  BMPs to Meet Other NMP Requirements

50.     The Permit, incorporating by reference the requirements of LAC 33:IX.2703.E.1, as alleged above in Paragraph 36, also requires Churchill Downs to implement an NMP that contains BMPs necessary to, *inter alia*,: "(a) ensure adequate storage of manure . . . and process wastewater, including procedures to ensure proper operation and maintenance of the storage facilities; . . . (c) ensure that clean water is diverted, as appropriate, from the production area; . . . (e) ensure that chemicals and other contaminants handled on-site are not disposed of in any . . . process wastewater, or storm water storage and treatment system that is not specifically designed to treat such chemicals or other contaminants; (f) identify appropriate site-specific conservation practices to be implemented, including as appropriate, buffers or equivalent practices, to control runoff of pollutants . . .; (g) identify protocols for appropriate testing of manure . . . [and] process wastewater . . .; [and] (i) identify specific records that will be maintained to document the implementation and management of the minimum [NMP] elements [required by LAC 33:IX.2703.E.1(a)-(h)]."

51.     As relevant to this Complaint, the LDEQ defines a CAFO's "production area" using the same definition as the EPA, as alleged above in Paragraph 42, and the LDEQ defines "process wastewater" using nearly the same definition as the EPA, as alleged above in Paragraph 48 (substituting the word "AFO" for "CAFO" as used by the EPA definition).  LAC 33:IX.2505.B.

### c. Other NMP Requirements

52.     The Permit, incorporating by reference the requirements of LAC 33:IX.2703.E.2, as alleged above in Paragraph 36, also requires Churchill Downs to comply with specific recordkeeping requirements for CAFOs, including that Churchill Downs maintains a copy of the Facility's site-specific NMP on-site.

53.     The Permit, incorporating by reference the requirements of LAC 33:IX.2703.E.4, as alleged above in Paragraph 36, also requires Churchill Downs to submit an annual report to the state permitting authority that includes, *inter alia*: information on the number and type of animals at the Facility; the total estimated amount of, *inter alia*, manure and process wastewater generated by the Facility in the previous 12 months; the total estimated amount of, *inter alia*, manure and process wastewater transferred by the Facility to another person in the previous 12 months; and a summary of all, *inter alia*, manure and process wastewater discharges from the production area that have occurred in the previous 12 months, including, for each discharge, the date time, and approximate volume.

54.     The Permit, incorporating by reference the requirements of LAC 33:IX.2703.E.5, as alleged above in Paragraph 36, also requires Churchill Downs to comply with the terms of its site-specific NMP.

55.     Additionally, the Permit (in "Other Conditions," Par. L (Compliance with Nutrient Management Plan)) directly requires compliance with the Facility's site-specific NMP and further directs that the NMP must include all applicable conditions stated in LAC 33:IX.2703.E.5 (alleged above in Paragraph 54).

56.     Additionally, the Permit (in "Other Conditions," Par. H (Nutrient Management Plan)) directly requires Churchill Downs to have an NMP that includes the following site-

specific requirements for the Facility: (a) there must be adequate storage and disposal of manure, bedding, and process wastewater to assure there is no contact with storm water runoff; (b) interceptor pits must be operated and maintained to assure that process wastewater is routed to the City of New Orleans publicly owned treatment works; (c) the Facility must utilize and document all BMPs at the Facility necessary to segregate waste from storm water; and (d) the Facility must submit annual reports containing complete summaries and schedules of the above practices.

### (4) Submission of Discharge Monitoring Reports

57.     In accordance with LAC 33:IX.2701.L.4, as incorporated into the Permit, Churchill Downs, as the LPDES permittee, has the duty to report monitoring results of wastewater or effluent monitoring on a DMR at the intervals specified in the Permit.

58.     The Permit (in "Submittal/Action Requirements," Condition S-1, and "Narrative Requirements," Condition T-1, respectively for each Outfall) requires Churchill Downs to prepare and submit a Quarterly DMR for each Outfall by: April 28 for monitoring in the months of January, February, and March; July 28 for monitoring in the months of April, May, and June; October 28 for monitoring in the months of July, August, and September; and January 28th, for monitoring in the months of October, November, and December.

59.     Additionally, the Permit (in "Narrative Requirements," Condition T-1, respectively for each Outfall) requires Churchill Downs to report in each DMR, for each Outfall, all discharges at any of the monitoring outfall(s) that occurred during the reporting period, or, if no such discharges occurred, to mark a pre-designated "no discharge" box on the DMR form.

**(5) Annual Reporting Requirements**

60.     The Permit (in "Other Conditions," Par. K (Annual Reporting)) requires Churchill Downs to submit annual reports to the LDEQ containing the information described in LAC 33:1X.2703.E.4. LAC 33:1X.2703.E.4(f) requires each annual report to include, *inter alia,* "a summary of all manure, litter, and process wastewater discharges from the production area that have occurred in the previous 12 months, including date, time, and approximate volume."

**(6) Pollutant Monitoring and Reporting Requirements**

61.     The Permit (in "Effluent Limitations and Monitoring Requirements," respectively for each Outfall) requires Churchill Downs to monitor discharges from the Facility for specified pollutant parameters, including but not limited to fecal coliform, and to comply with listed discharge limitations and monitoring requirements for each parameter.

62.     The Permit (in "Narrative Requirements," as applicable to the entire Facility, Condition T-1) requires Churchill Downs to report violations of daily maximum limitations for pollutants such as, *inter alia*, fecal coliform. Additionally, the Permit (in "Narrative Requirements," Condition T-1, respectively for each Outfall) requires Churchill Downs to report in each DMR, for each Outfall, *inter alia*, discharges of fecal coliform.

**D.     The Facility's Site-Specific NMP**

63.     On September 27, 2013, Churchill Downs submitted to the LDEQ an NMP and designated it as the Facility's "2012 Nutrient Management Plan (NMP) and Best Management Practices (BMP)" ("the Facility's NMP"). The Facility's NMP remains applicable as of the date of this Complaint.

64.     Section 1 of the Facility's NMP describes manure and waste handling practices, in particular: subsection (A) sets forth manure storage requirements, including the required use

15

of dumpsters for manure and related waste; subsections (B) and (C) set forth disposal, removal, and composting requirements for manure and bedding; and subsection (D) sets forth process wastewater isolation requirements, including the Facility's obligation to transfer such wastewater to the City of New Orleans' municipal sanitary sewer system, operated by the SWBNO (the "SWBNO Sanitary Sewer").

65.     Section 2 of the Facility's NMP describes interceptor pit practices, in particular: subsections (E) and (F) set forth operation and maintenance requirements, including weekly servicing of the pits by a contractor and removal of sand/sludge debris from the pit during servicing; subsection (G) sets forth storm water discharge requirements, including sampling during rain events and monitoring rainfall amounts in 24-hour increments; and subsection (H) sets forth washing machine operation requirements, including that washing machines are provided with discharge hook ups that flow directly into the SWBNO Sanitary Sewer.

66.     Section 3 of the Facility's NMP describes additional BMPs, in particular: subsection (I) sets forth dumpster content removal practices, to be performed by contracted commercial disposal and composting companies, and twice-daily emptying of trash containers; subsection (J) sets forth sand pit removal and recordkeeping practices, to be performed by a contractor; subsection (K) sets forth notification practices for warning and instructing horse trainers about BMPs; and subsections (L) and (M) set forth practices for monitoring the Facility for improper discharges of horse wash water or other NMP violations, recording discovered violations, notifying the violator of the discovered violations, and taking enforcement action against violators.

16

### E. CWA Enforcement Provisions

67. Section 309(b) of the Act, 33 U.S.C. § 1319(b), authorizes civil actions for "appropriate relief, including a permanent or temporary injunction" for any violation of, *inter alia*, any permit condition or limitation in a permit issued under Section 402 of the Act, 33 U.S.C. § 1342.

68. Pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Bipartisan Budget Act of 2015, Pub. L. No. 114-74, Section 701, 129 Stat. 584, 599-60, any person who violates, *inter alia*, any permit condition or limitation in a permit issued under Section 402 of the Act, 33 U.S.C. § 1342, is also subject to civil penalties not to exceed $37,500 per day for each violation that occurred between January 12, 2009 and November 2, 2015, and $54,833 per day for each violation occurring on or after November 2, 2015, and assessed on or after February 6, 2019.  84 Fed. Reg. 2056 (February 6, 2019) (EPA Civil Monetary Penalty Inflation Adjustment Rule) and 84 Fed. Reg. 5955 (February 25, 2019) (Correction). *See also* 40 C.F.R. § 19.4.

### GENERAL ALLEGATIONS

69. The Facility is located on approximately 145 acres at 1751 Gentilly Boulevard, New Orleans, New Orleans Parrish, Louisiana. The Facility is located in downtown New Orleans and surrounded by residential neighborhoods.

70. The Facility is one of Louisiana's oldest commercial horse racetracks.  It is utilized as a thoroughbred and quarter horse racetrack for approximately seven to eight months every year. The Facility includes a one-mile dirt racetrack and a 7/8-mile turf racetrack, the

infield area, the grandstand, the casino, and associated parking areas. The Facility also includes an area of approximately 38.8 acres (the "Production Area") that contains stables, horse stall barns and receiving barns, horse wash racks, horse walkways, horse walkers, manure storage areas (including dumpsters used for manure and waste bedding), and storage areas for raw materials. The Production Area is a "production area," as that term is used in the Permit and the applicable EPA and LDEQ regulations.

71.     The Facility hosts two major racing meets each year. The Quarter Horse Meet, which is typically four to six weeks long and traditionally begins in late July or early August, and the Thoroughbred Meet, which is typically four months long and traditionally begins in November. Horses arrive on site and are stabled at the Facility three to four weeks before a meet and remain on site until two to three weeks after the meet's conclusion.

72.     At all times relevant to this Complaint, the Facility stabled or confined over 500 horses for at least 45 days during a 12-month period. The Facility's full capacity to house horses under roof is 2000. During the 2017 meets, the Facility stabled up to 1,879 horses. The Facility operated, and continues to operate, as a Large CAFO, as that term is used in the Permit and the applicable EPA and LDEQ regulations.

**A. Process Wastewater Discharges**

73.     The Facility generates "process wastewater," as that term is used in the Permit and the applicable EPA and LDEQ regulations, from the Production Area, including: (a) horse wash rack water; (b) hose-down water and washing machine water; and (c) contaminated storm water. Horse wash rack water is water that is directly or indirectly used in the operation of the Facility for washing horses and is generated when the animals are cleaned with soap or water to remove manure, bedding, or other debris or to cool the animals. Hose-down water and washing

machine water are water directly or indirectly used in the operation of the Facility for, respectively, spraying surfaces for dust control or to wash, clean, or flush barns, dumpster areas, or other CAFO equipment, and washing items used on the horses, *e.g.*, bandages or wraps, in on-site machines to remove waste or biological material.  Contaminated storm water is water generated when rain water directly or indirectly falls upon the Production Area and comes into contact with exposed raw materials, products, or byproducts, including manure, feed, or waste bedding, in unprotected animal confinement areas, manure storage areas, raw materials storage areas, or waste containment areas.

74.     The process wastewater generated by the Facility contains manure, urine, horse wash water, and other "biological materials" that are "pollutants" as those terms are used in the Permit and the applicable EPA and LDEQ regulations.  Additionally, the process wastewater generated by the Facility contains nitrate, phosphorus, and fecal coliform, and is "agricultural waste," which is a "pollutant," as those terms are used in the Permit and the applicable EPA and LDEQ regulations.

75.     The Facility does not have a retention structure or lagoon designed to hold process wastewater generated in the Production Area.  Process wastewater from the Production Area drains into manholes and a system of underground pipes within the Facility.  The untreated process wastewater flows through the Facility drainage system and exits the Facility at Outfalls 001, 002, and 003.

76.     Outfall 001 is located near the northwest corner of the Production Area, adjacent to a barn currently or formerly designated as Barn 41.  At all times relevant to this Complaint, Outfall 001 has been equipped with a weir that creates a "catch basin" inside the drainage infrastructure within the outfall's wet well.  This weir allows for water storage or holding

capacity within the catch basin and within the pipes leading to the catch basin. A 1-horsepower pump is located on the upstream side of the weir structure, which allows Churchill Downs to transfer waters from the drainage infrastructure to the SWBNO Sanitary Sewer under normal operating conditions. However, when the pump is inoperable or during particular rain events, depending on the amount and intensity of the rainfall, flows overcome the pumping and storage capacity of the catch basin and waters from the Outfall 001 drainage infrastructure overflow into the SWBNO MS4.

77.     Outfall 002 is located at the northern edge of the Production Area near Belfort and Lopez Streets. Since at least January 2016 and continuing through the date of this Complaint, Outfall 002 has been equipped with: (a) a wet well, (b) a screen manhole, and (c) a gate valve, all of which connect to a 36" storm water line that runs north from the wet well, through the screen manhole and gate valve and then to a Storm Sewer Manhole ("the Belfort Street SSMH") located just outside the boundary of the Facility on Belfort Street near the intersection of Lopez Street. Outfall 002's wet well receives inflows from, at a minimum, the Production Area and stores the received water inside a holding area that connects with, and - when it is full - gains additional holding capacity from, the drainage infrastructure within the Production Area and the infrastructure within the outfall (i.e. the 36" connecting line and screen manhole south of the gate valve). Outfall 002's screen manhole also receives separate inflows from the Production Area near west Belfort Street by way of drainage infrastructure that does not directly connect to the outfall's wet well. The wet well is equipped with a 1-horsepower pump and a 5-horse power pump, and Outfall 002's screen manhole is equipped with a 3-horsepower pump, each of which connect to separate inlets to the SWBNO Sanitary Sewer. Under normal operating conditions when the gate valve is closed, these three outfall pumps operate to allow Churchill Downs to

transfer process wastewater from Outfall 002's wet well holding capacity into the SWBNO Sanitary Sewer. An actuator controls the open or closed positioning of the gate valve.  The actuator is programmed to open the gate valve when rainfall data from a nearby weather station indicates a rain event of 0.48 inches or more and the wastewater level within the outfall's wet well (including connected Production Area drainage infrastructure and outfall infrastructure) has risen to a pre-set programmed threshold level.  Outfall 002 has a fourth pump, a 35-horsepower pump, that is located inside the wet well and operates only when the gate valve is open to transfer flows from the Outfall 002 wet well and screen manhole drainage infrastructure through the 36" connecting line and into the Belfort Street SSMH, from where the flows exit the Belfort Street SSMH through an outlet that enters the SWBNO MS4.

78.     Prior to the configuration of Outfall 002 as alleged above in Paragraph 77, Outfall 002 had several different configurations that did not include a gate valve, some of which included the use of different plugs and pumps.  During the various previous configurations of Outfall 002, and at all times relevant to this Complaint, under normal operating conditions flows from the Outfall 002 wet well were directed to the SWBNO Sanitary Sewer by one or more pumps, but under certain conditions flows from the Outfall 002 wet well entered into the MS4.

79.     Outfall 003 is located at the southwestern side of the Production Area, adjacent to the barn currently or formerly designated at Barn 28.  At all times relevant to this Complaint, Outfall 003 has been equipped with a sump which creates a "catch basin" inside the drainage infrastructure within the Production Area.  This sump allows for some water storage or holding capacity within the catch basin and within the pipes leading to the catch basin. A pump is located in the sump which allows the Facility to transfer waters from the drainage infrastructure into the SWBNO Sanitary Sewer under normal operating conditions.  However, if the pump is inoperable

or during particular rain events, depending on the amount and intensity of the rainfall event, flows overcome the pumping and storage capacity of the catch basin, and waters from the Outfall 001 drainage infrastructure overflow into the SWBNO MS4.

80.     Within the SWBNO MS4, Drainage Pump Station #3 pumps waters into the London Avenue Canal, which flows into Lake Pontchartrain.  Discharges at Drainage Pump Station #3 also flow through the Florida Canal and the Inner Harbor Navigational Canal to the Mississippi River.  Lake Pontchartrain and the Mississippi River flow to the Gulf of Mexico. Lake Pontchartrain, the Mississippi River and the Gulf of Mexico are navigable waters within the meaning of 40 C.F.R. § 401.11(l) (1993) and 40 C.F.R. § 412.2(a), as used in the effluent limitation applicable to large horse CAFOs at 40 C.F.R. § 412.13, and are Waters of the State within the meaning of the LPDES permit program, the conditions of which are incorporated into the Permit, as used in the Effluent Limitations and Monitoring Requirements section of the Permit.

81.     The flow of process wastewater from any of the Facility's outfalls into the SWBNO MS4, which directs flows into Lake Pontchartrain or the Mississippi River, is a "discharge of pollutant(s)" within the meaning of 40 C.F.R. § 401.11(h) and 40 C.F.R. § 412.2(a), as used by the effluent limitations applicable to large horse CAFOs at 40 C.F.R. § 412.13, and a "discharge" within the meaning of the LPDES permit program, the conditions of which are incorporated into the Permit, as used in the Effluent Limitations and Monitoring Requirements section of the Permit.

**B.   Discharges in Violation of the Permit**

**(1) Wet Weather Discharges**

82.     On November 21, 2013, the EPA, the LDEQ, and the SWBNO inspected the

Facility. Based on the EPA inspectors' observations and a review of records by the EPA during

and after the November 2013 inspection, the EPA determined that the Facility was discharging

pollutants into the SWBNO MS4 during several rain events that did not qualify as 25-year, 24-

hour precipitation events, in violation of the Permit, and notified Churchill Downs of this

conclusion.

83.     On December 3, 2013, the EPA issued a Cease and Desist Order to Churchill

Downs requiring it to: (a) immediately cease and desist all discharges of pollutants to waters of

the United States resulting from inoperable lift pumps at Outfalls 001 and 002; (b) devise a plan

to address the unauthorized discharges of process wastewater to the SWBNO MS4 during

rainfall events of less than 10 inches in 24 hours; and (3) submit such a plan to the EPA and the

LDEQ for review and approval.

84.     The EPA met with Churchill Downs several times, including in January and April

2014 and February 2015, with respect to the Cease and Desist Order and the company's

response.  Churchill Downs admitted during these meetings that the Facility can contain and

direct flow from the Production Area into the SWBNO Sanitary Sewer within the existing

wastewater infrastructure at the Facility only during wet weather events of about 0.5 inches of

rainfall, or less, in a 24-hour period and that rainfall events exceeding this amount result in

overflow into the SWBNO MS4.

85.     Wet-weather discharges to the SWBNO MS4 from the Facility during rain events

that do not qualify as 25-year, 24-hour precipitation events, in violation of the Permit, have

occurred since the effective date of the Permit (February 1, 2012) through the present and will continue to occur.

86.     From February 1, 2012 through August 15, 2018, there were at least 141 rain events at the Facility exceeding 1 inch, but not exceeding 10 inches, of rain in a 24-hour period, during which wet-weather discharges to the SWBNO MS4 necessarily occurred, and 114 such events exceeding 0.5 inches of rain, but not reaching 1 inch of rain, in a 24-hour period, during which such discharges likely occurred.

87.     Churchill Downs' own summaries of discharges included in annual reports submitted since the effective date of the Permit for the years 2012, 2013, 2014, 2015, 2016, and 2017 indicate that design limitations at the Facility likely resulted in discharges of process wastewater from the three outfall locations into the SWBNO MS4 during each rain event that exceeded 0.48 inches.

88.     In addition, on January 26 and 27, 2016, the EPA, the LDEQ, and the SWBNO inspected the Facility.  During this inspection, the inspectors were informed by Churchill Downs that a rain event during the late afternoon and night of January 16th would have resulted in wet weather discharges to the SWBNO MS4, in violation of the Permit.

**(2)  Dry Weather Discharges**

89.     During the November 2013 inspection, inspectors observed and documented an ongoing dry weather discharge of process wastewater into the SWBNO MS4.  The discharge resulted when process wastewater from Outfall 002, configured as alleged in Paragraph 78, exited the Belfort Street SSMH and flowed into the SWBNO MS4 as a result of an inoperable pump.  The inspectors also observed and documented washing machine water draining from approximately six washing machines at the Facility to the ground in the production area, from

where the washing machine water flowed to Outfall 002 and, as a result of the inoperable pump, discharged into the SWBNO MS4, in violation of the Permit.

90.     From October 27 through November 17, 2014, the SWBNO inspected and investigated the Facility and observed and documented dry weather discharges of process wastewater, including horse wash water, at Outfall 002, configured as alleged in Paragraph 78, into the Florida Canal.  The SWBNO concluded that the Facility had removed a pump that had been previously observed at Outfall 002 and used to pump process wastewater to the SWBNO Sanitary Sewer at Outfall 002.  The SWNBNO additionally concluded that the Facility was operating a different pump – the 35-horsepower storm water pump – to actively direct flow from Outfall 002 to the SWBNO MS4.  Removal of the pump that previously directed process wastewater flow to the SWBNO Sanitary Sewer and use of another pump to direct flow into the SWBNO MS4 resulted in discharges of the process wastewater in violation of the Permit.

91.     On January 13, 2015, the EPA, the LDEQ and the SWBNO inspected the facility again and observed and documented ongoing dry weather discharges of process wastewater at Outfalls 002 and 003.  At Outfall 002, configured as alleged in Paragraph 78, inspectors observed that a plug at the Belfort Street SSMH had been removed, because of a recent rainfall event and ongoing water leak into the Belfort Street SSMH.  Inspectors also observed that a pump at the Belfort Street SSMH was dislodged and not operable, so wastewater flows, including observed incoming flows of horse wash rack water and flows from the Outfall 002 wet well, were not being directed to the SWBNO Sanitary Sewer and instead flowed to the SWBNO MS4, resulting in a discharge in violation of the Permit. At Outfall 003, inspectors observed that the pump was switched off and non-operational, which prevented flow from entering the

SWBNO Sanitary Sewer and instead directed flow to the SWBNO MS4 resulting in a discharge in violation of the Permit.

92.     On December 22, 2017, Churchill Downs reported to the LDEQ a discharge of process wastewater (horse wash water), described as less than 500 gallons, to a previously unknown and unpermitted outfall at the Facility and then to the SWBNO MS4, in violation of the Permit.

### (3) Nutrient Management Plan Violations

93.     During the November 2013 inspection, inspectors observed and documented the following violations of the Facility's Original NMP:  approximately six washing machines that were not hooked up to direct wastewater to the SWBNO Sanitary Sewer; undersized pumps at the outfalls that were not designed to store and direct all of the Facility's wastewater to the SWBNO Sanitary Sewer; horse wash racks set up outside the barns with horse wash water flowing through the production area and commingling with storm water, rather than being routed to the SWBNO Sanitary Sewer; and bedding stored openly on the ground instead of in dumpsters for disposal.

94.     During the January 2015 inspection, inspectors observed and documented the following violations of the Facility's NMP: undersized or improperly operated pumps that were not designed or used to store and direct all of the Facility's wastewater to the SWBNO Sanitary Sewer; horse wash racks set up outside the barns with horse wash water flowing through the Production Area with each use, where it would route to outfalls and commingle with storm water; manure and bedding present on the ground and accumulating around drains at one or more outfalls, including manure that had been hosed down from pavement into the storm drain; dumpsters that were filled beyond capacity and overflowing with manure and bedding spillage

present around and underneath the dumpsters; dumpsters with open lids; and storm water that was not diverted from entering the Production Area.

95.     During the January 2016 inspection, inspectors observed and documented the following violations of the Facility's NMP: horse wash racks set up for horse washing outside of the barns with horse wash water flowing through the Production Area with each use, where it could commingle with storm water; manure present on the ground and accumulating around the drains at one or more outfalls; and storm water that was not diverted from entering the Production Area.

96.     On December 12, 2016, the SWBNO inspected the Facility.  During the December 2016 inspection, inspectors observed and documented the following violations of the Facility's NMP: manure, bedding and sand present on the ground and accumulating around drains at one or more outfalls; horse wash racks set up outside the barns with horse wash water flowing through the Production Area with each use, where it would route to outfalls and commingle with storm water, rather than being routed to the SWBNO Sanitary Sewer; waste materials containing manure and bedding accumulating in areas other than in dumpsters; and the use of water to wash down manure, bedding, and sand in the Production Area to direct the process wastewater to outfalls.

97.     On January 15, 2017, the SWBNO inspected the Facility.  During the January 2017 inspection, inspectors observed and documented the following violations of the Facility's NMP: dumpsters with manure and bedding spillage present around and underneath the dumpsters, and leaking dumpsters; manure and bedding present on the ground and accumulating around the outside of the barns and at drains at one or more outfalls; and waste materials containing manure and bedding accumulating in areas other than in dumpsters.

98.     On February 8, 2018, the SWBNO inspected the Facility. During the February 2018 inspection, inspectors observed and documented the following violations of the Facility's NMP: manure and bedding present on the ground and accumulating around the outside of the barns and at drains routing to one or more outfalls; and washing machines that were not hooked up to direct wastewater to the SWBNO Sanitary Sewer.

99.     The violations of the Facility's NMP that the EPA, the LDEQ and/or  the SWBNO observed and documented during the inspections described above violate the CWA because they demonstrate the Facility's failure to comply with the Permit, including the requirement that they implement an NMP with BMPs that: (a) ensure adequate storage and disposal of manure, bedding, and process wastewater, including procedures to ensure proper operation and maintenance of the storage facilities; (b) divert clean water, as appropriate, from the Production Area; and (c) use specific conservation practices to control runoff of pollutants to waters of the United States.

100.     Subject to a reasonable opportunity for further investigation and discovery, the wet weather and dry weather discharges described above resulted, at least in part, from Churchill Downs' failure on numerous occasions to fully implement its NMP as required by the terms of the Permit, including Churchill Downs' failure to:  (a) ensure adequate storage and disposal of manure, bedding, and process wastewater to assure there is no contact with storm water runoff; (b) operate and maintain all wastewater interceptors to assure that process wastewater is routed to the City of New Orleans publicly owned treatment works; and (c) utilize all BMPs at the Facility necessary to segregate waste from storm water.

### C. Deficient DMRs and Annual Reports

101.    Churchill Downs submitted three DMRs to the LDEQ after the due date for such reports as follows: (a) A DMR for the first quarter of 2012  submitted on May 11, 2012, rather than by the due date of April 28, 2012 (13 days late); (b) A DMR for the fourth quarter of 2013 submitted on February 22, 2013, rather than by the due date of January 28, 2013 (25 days late); and (c) A DMR for the second quarter of 2013 submitted on August 22, 2013, rather than by the due date of July 28, 2013 (25 days late).

102.    Since February 2012, four of Churchill Downs' quarterly reports failed to include any monitoring and reporting data for fecal coliform: specifically, the quarterly reports submitted for the first quarter of 2012, and the first, third, and fourth quarters of 2013.

103.    Churchill Downs' annual reports submitted pursuant to the Permit for the years 2012, 2013, 2014, 2015, 2016, and 2017 consistently report only the following statement for the "summary of discharges" section of the reports: "It is expected that precipitation events exceeding 0.48" at the facility resulted in discharge(s) to the [SWBNO MS4] from the three identified outfall locations during [the subject year] due to limitations in the current collection and drainage system."

104.    Churchill Downs' annual reports submitted pursuant to the Permit since 2012 have failed to provide, as required by the Permit and LAC 33:1X.2703.E.4(f), a summary of all manure, litter, and process wastewater discharges from the Production Area that occurred in the previous 12 months, including date, time, and approximate volume.

### FIRST CLAIM FOR RELIEF
### Civil Penalties and Injunctive Relief for Discharges in Violation of the Permit

105.    Paragraphs 1 through 104 are re-alleged and incorporated herein by reference.

106.     In violation of the Permit, on numerous occasions, including during rain events of greater than 1 inch (at a minimum) and less than 10 inches, and during dry weather, Churchill Downs discharged pollutants through Outfalls 001, 002 and 003, including, *inter alia*, process wastewater, into the SWBNO MS4 and thence to Waters of the State or waters of the United States, including Lake Pontchartrain, the Mississippi River and the Gulf of Mexico, and will continue to do so unless enjoined by the Court.

107.     As a result of each violation of the terms and conditions of the Permit, Churchill Downs is subject to civil penalties to the United States, pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d,) as described above in  Paragraph 68,

108.     Because Churchill Downs continues to violate the Permit, Churchill Downs is liable for injunctive relief to the United States pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b).

## SECOND CLAIM FOR RELIEF

### Civil Penalties and Injunctive Relief for Failure to Comply with Permit Conditions Relating to Nutrient Management Plan

109.     Paragraphs 1 through 104 are re-alleged and incorporated herein by reference.

110.     In violation of the Permit, on numerous occasions, Churchill Downs failed to comply with the NMP requirements of the Permit to: (a) ensure adequate storage and disposal of manure, bedding, and process wastewater to assure there is no contact with storm water runoff; (b) operate and maintain all wastewater interceptors to assure that process wastewater is routed to the City of New Orleans publicly owned treatment works; and (c) utilize all BMPs at the Facility necessary to segregate waste from storm water; and will continue to do so unless enjoined by the Court.

111.    As a result of each violation of the terms and conditions of the Permit, Churchill Downs is subject to civil penalties to the United States, pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d,) as described above in  Paragraph 68.

112.    Because Churchill Downs continues to violate the NMP requirements of the Permit, Churchill Downs is liable for injunctive relief to the United States pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b).

### THIRD CLAIM FOR RELIEF
**Civil Penalties and Injunctive Relief for Failure to Comply with Permit Conditions Relating to the Timely Submission of DMRs**

113.    Paragraphs 1 through 104 are re-alleged and incorporated herein by reference.

114.    In violation of the Permit, on at least three occasions, for a total of 63 days late, Churchill Downs failed to submit a quarterly DMR for each Outfall by the required deadlines of April 28 for monitoring in the months of January, February, and March, July 28 for monitoring in the months of April, May, and June, and January 28th, for monitoring in the months of October, November, and December, and may continue to do so unless enjoined by the Court.

115.    As a result of each violation of the terms and conditions of the Permit, Churchill Downs is subject to civil penalties to the United States, pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d,) as described above in  Paragraph 68.

116.    Because Churchill Downs failed to submit DMRs by the deadlines required by the Permit and may do so again in the future, Churchill Downs is liable for injunctive relief to the United States pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b).

### FOURTH CLAIM FOR RELIEF
**Civil Penalties and Injunctive Relief for Failure to Comply with Permit Conditions Relating to the Reporting Discharges in Annual Reports**

117.    Paragraphs 1 through 104 are re-alleged and incorporated herein by reference.

118.    In violation of the Permit, Churchill Downs failed to submit annual reports to the LDEQ containing the information described in LAC 33:1X.2703.E.4, including "a summary of all manure, litter, and process wastewater discharges from the production area that have occurred in the previous 12 months, including date, time, and approximate volume."

119.    As a result of each violation of the terms and conditions of the Permit, Churchill Downs is subject to civil penalties to the United States, pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d,) as described above in  Paragraph 68.

120.    Because Churchill Downs failed to submit annual reports complying with the Permit and may do so again in the future, Churchill Downs is liable for injunctive relief to the United States pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b).

## FIFTH CLAIM FOR RELIEF

### Civil Penalties and Injunctive Relief for Failure to Comply with Permit Conditions Relating to Monitoring and Reporting Data for all Pollutants

121.    Paragraphs 1 through 104 are re-alleged and incorporated herein by reference.

122.    In violation of the Permit, on at least four occasions, Churchill Downs' quarterly reports failed to include any monitoring and reporting data for fecal coliform.

123.    As a result of each violation of the terms and conditions of the Permit, Churchill Downs is subject to civil penalties to the United States, pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d,) as described above in Paragraph 68.

124.    Because Churchill Downs failed to report monitoring data for fecal coliform and may do so in the future, Churchill Downs is liable for injunctive relief to the United States pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Enter judgment that Churchill Downs is liable to the United States for civil

penalties pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and assess

civil penalties of up to $37,500 per day for each violation through November 2, 2015, and up to

$54,833 per day for each violation that occurred on or after November 2, 2015.

B.      Enter judgment that Churchill Downs is liable to the United States for all

appropriate injunctive relief, including ordering Churchill Downs to develop and implement

appropriate best management practices, eliminate facility design constraints that are facilitating

ongoing wet-weather discharges, and implement other CAFO waste management plans to cease

future unauthorized discharges and immediately comply with all applicable federal CAFO

regulations and requirements of the Act, pursuant to Section 309(b) of the Clean Water Act, 33

U.S.C. § 1319(b);

C.      Award the United States its costs in this action; and

D.      Grant the United States such other relief as the Court deems appropriate.


JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


_____
NICOLE VEILLEUX
Senior Counsel
Phone: (202) 532-3348
Email: nicole.veilleux@usdoj.gov
ASIA A. MCNEIL-WOMACK (Ga Bar # 821002)
Trial Attorney
Phone: (202) 305-0544
Email: asia.mcneil-womack@usdoj.gov
Environmental Enforcement Section
Environment and Natural Resources Division

U.S. Department of Justice
Washington, DC  20044-7611


PETER G. STRASSER
UNITED STATES ATTORNEY

*s/ Peter M. Mansfield*
PETER M. MANSFIELD (#28671)
Assistant United States Attorney
Chief, Civil Division
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3047
Email: peter.mansfield@usdoj.gov

OF COUNSEL:
ELLEN CHANG-VAUGHN
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas  75202-2733

ROBYN HANSON EMESON
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 8
Office of Regional Counsel
1595 Wynkoop Street
Denver, CO 80902

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**DEFENDANTS**

CHURCHILL DOWNS LOUISIANA HORSERACING COMPANY, LLC d/b/a FAIR GROUNDS RACE COURSE AND SLOTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Orleans Parish
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Nicole Veilleux, Senior Counsel, Ph: (202) 532-3348, Asia A. McNeil-Womack, Trial Attorney, Ph: (202) 305-0544, United States Dept. of Justice, ENRD, EES, P.O. Box 7611, Washington, D.C. 20044-7611

Attorneys *(If Known)*
Todd S. Mikolop, Hunton Andrews Kurth LLP, 2200 Pennsylvania Ave., NW, Washington, DC 20037, Ph: (202) 778-2249

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☒ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☒ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Clean Water Act, 42 U.S.C. §§ 1319, 1342

Brief description of cause:
Action for civil penalties & injunctive relief, 42 U.S.C. § 1319, for violations of permit issued under 42 U.S.C. § 1342

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
09/11/2020

SIGNATURE OF ATTORNEY OF RECORD
/s Nicole Veilleux

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____